in Section 406B, such representation? Do they refer to work done only before the Court, the only representation discussed in Section 406B itself, or do they also include work done before the agency, which is subject to a separate award mechanism in Section 406A? In this case, Your Honors, the subject of the argument is not the  statute's text, its structure, its purposes, and its history. All confirm that Section 406B's cap applies only to work done in court. First, the text. Section 406B references explicitly and only work done in the Court. It's in a single sentence. It says, Whenever a court renders a judgment favorable to a claimant who is represented before the Court by an attorney, the Court may allow a reasonable fee for such representation. The dictionary meaning of the word such, of the sort previously mentioned, confirms what is commonsensical. So does the doctrine of the canon of expressio unius. Section 406A, by contrast, speaks of work done before the Commissioner. Section 406B speaks only of work done before the Court. Congress also, Your Honor, knew how to create an aggregate cap if it wanted to. In Section 406A, the statute is involving both claims under Title II and Title XVI, and it uses the words in the aggregate. Congress likewise knew how to create offsets, as it did in the Equal Access to Justice Act. Also, Your Honors, the structure of the Act makes this clear. In Gisbret, this Court said that the statute handles discreetly claims for work before the agency and claims before the Court. Ginsburg. Can I ask you a question about the cap? You're saying there's a cap in B, and that applies to court services, not to services before the agency. But is there a cap on the amount that can be taken from the plaintiff's recovery? That is, let's say, we agree with you that the B cap is for court only. It doesn't apply to administrative services. Can more be taken from the plaintiff's recovery than, what is it, 25 percent? No, Justice Ginsburg. The agency has taken a position which is not contested in this litigation, that there is a separate 25 percent pay cap which apply. They will set aside the amount of past due benefits and withhold the 25 percent for the payment of attorney's fees under both 406B and 406A. So that is an upper limit in this case. This case goes to the plaintiff's recovery. I do have a question about that. I'm troubled by the idea of attorneys attempting to collect fees directly from their clients. Now, I understand from the briefing that you can't garnish disability benefits. So if you don't get paid your percentage, you can't garnish disability benefits. But how can you collect otherwise? You don't collect over the fund that Justice Ginsburg is describing, the retained amount. Don't you think that Congress wouldn't have wanted Social Security recipients to be hounded by collection efforts? Well, Your Honor, first I want to correct what may be a misconception. It is not the case that when the 25 percent authorization cap is used up, that attorneys, if they don't get paid, they don't get paid directly. In any case, when there is an EJA award, as there are in over 40 percent of these cases, and the EJA award is equal to or exceeds the 406A award, the attorney can actually get the money from the amount that the agency is still collecting. I understood here there was some EJA money that you could have received. Yes. But I'm talking about the extreme possibility.  Where there's a small EJA award, but you get 50 percent of the recovery. Are we going to have people garnishing something or attaching something that belongs to clients? Not in most cases, Your Honor. In most cases, it makes no economic sense. I'm not asking about most cases. I'm asking about exceptions. Well, there would be an exception, Your Honor, if I were representing Bill Gates, say, I could go after him for payment of the remaining fees. Most of the claimants, of course, do not have much money. And the statute, as Justice Ginsburg says, puts a 25 percent cap on how it's going to, the pool, I guess, from which it's going to be paid by the agency. Doesn't that suggest that Congress thought that there would be an aggregate cap because, A, there is the pool cap and then, as Justice Sotomayor says, we don't expect lawyers to go after claimants who, by definition, often can't work and often don't have much money? Well, Justice Kavanaugh, the pool cap is a matter, is a creature of agency work, not actually an artifact of what Congress has done. So it's you cannot impute that, actually, to what Congress is feeling here was. As you mentioned, in most cases, in many of these cases, the claimant will be judgment-proof beyond the amount that the agency has set aside. And in those circumstances, it makes no sense for the attorney to go after the claimant. The answer is, am I right, that, look, in an EAJA case where you collect the money from the government, the lawyer gets money from, he takes the fee out of that, is that right? The attorney has to effectively return the lesser of the EAJA fee or the 406B fee. Okay. So if the amount from the client is less than the EAJA award, the attorney gets the greater amount and returns the other to the client, so the client doesn't have to pay, okay, anything, perhaps. So if there's no EAJA award, so take that out of the picture, and you win this case, there's yet another check. There has to be a reasonable fee, and the judge is in charge of that. Yes, Your Honor. All right. Okay. So it has to escape that. But if it does escape that, then the The lawyer can be authorized for 50 percent, if that's possible. The lawyer can be authorized. I mean, I'm not trying to – I'm just trying to find – get the thing straight in my mind. Yes, that's possible. No EAJA fee of greater amount, the judge doesn't say it's an unreasonable thing to do, and the client has the money, and then you could bring it up to 50 percent. Yes, Your Honor. And your argument against that is that's like the null set. Unless Gates happens to be on welfare, which I think he is. Yes. Well, it would make no sense for an attorney to waste his or her time pursuing such claimants. People go after people who are essentially judgment-proof, Your Honor. And it's my understanding that's actually how the world works in practice. The amicus is brief. I have a question that bothers me greatly about this whole litigation. It seems like your interests are contrary to your client's interests, meaning your client under no circumstance should want the danger of paying more than a 25 percent aggregate. So shouldn't you have gotten a different lawyer for her at some point in this litigation earlier than here? No, Your Honor. Our client has actually been notified every step along the way about what's an amicus. That's not true consent. At least when I was a district court judge, you had to not only advise her, but advise her of the potential conflict and advise her to seek separate counsel. Was that done? I don't believe that that was done in this case. I am troubled by these fee disputes because I often wonder if clients are being adequately represented once the dispute moves from the main case and into how much you're entitled to. But in this case, Your Honor, not only was Ms. Wood informed of what was happening, but she had consented to it. Not without being told of the potential conflict. I don't know in depth how much it was explained to her. Practically, where would you — you can't get the money out of the Social Security benefits if they've been exhausted under B for the court work. So where would you go to get that, to get more than 25 percent, not from the Social Security benefits, but some other source? Your Honor, if there are no EJIA fees in the picture, which would increase the size — effectively increase the size of the pot, and the claimant can't pay any more money, you would take your lumps and leave. The lawyer at that point would swallow the loss in fees, typically what happens. There's no sense in wasting time trying to squeeze blood from a turnip. Well, wouldn't that — if that's the general case, then what are the practical consequences of our agreeing with your position when you can't get more than 25 percent out of the Social Security benefits themselves? Well, the practical implications of the aggregate cap rule, Your Honor, is that attorneys will be less willing to take on these cases ex ante, because they will understand that in many cases they will not be getting fees for work in court because that pool will have been expanded — How many cases have EJIA awards? In Gisbrecht, Your Honor, the concurrence mentioned that it was 41 percent. It is our understanding that more up-to-date statistics are above 40 percent to 50 percent, somewhere in there. So in about 40 to 50 percent of the cases, there will always be a pot bigger than the 25 percent? Yes, Your Honor. That's what you're fighting for, is that 25 percent? Yes. But the aggregate rule does not allow the attorney access to any of that. The non-aggregate approach, which we're advocating, does. Does. So even under the aggregate rule, that extra money under EJIA is simply unavailable to the attorney. It goes straight — all of it would go straight to the client. Under our approach, that month the EJIA award is effectively split and divided between the claimant and the attorney. A-4, I thought, established a 25 percent cap on the pool, the statute itself. You said it didn't come from the statute. Maybe I'm misreading something. No. A-4 is a little bit unclear, Your Honor. A-4 talks about the maximum. Well, it seems very clear. It says 25 percent. No. It does say 25 percent, but it also says the maximum fee, which is a technical term for the agency award. The maximum fee is not a term from 406-B. It's from 406-A. That pool established under A-4 is the only pool that Justice Ginsburg has been referencing. That's the only pool, correct? That is the only pool. The agency I believe — And that's capped. The pool is capped by statute at 25 percent. No, Your Honor. The pool is capped with respect to 406-B awards at an overall 25 percent by the agency. I believe my friend Mr. Yang can perhaps answer this better. The regulations interpreting that do cap the pool then at 25 percent as well. They do. But I believe that the support in the statute that they point to for that is not anything in 406-A, but is actually 406-B's language, where it says that a — that the Commissioner may award — it's in 406, it's on page 8A of the government's opening merits brief. About halfway down B it says, And the Commissioner of Social Security may, notwithstanding Section 401i of this title, but subject to subsection D, certify the amount of such fee for payment to such attorney out of and not in addition to the amount of such past due benefits, and that the agency has taken the view that that gives it the discretionary authority to cap the overall pool that's available for 406-B awards as well. Your Honors, the — if I may, Your Honors, I would like to reserve my remaining time for rebuttal. Thank you, counsel. Thank you. Mr. Yang. Yang, Mr. Chief Justice, and may it please the Court. There is one — only one operative provision in this case, and it's Section 406-B1a. That provision applies when a claimant is represented, quote, represented before the court by an attorney, unquote, and it authorizes a reasonable fee for such representation. That provision clearly governs fees only for representation before the court and its 25 percent past due benefits cap. Likewise, only applies to fees for work done before the court. That text fully resolves this case. The Court has had a series of questions about kind of some of the practicalities. I'd like to address first Justice Kavanaugh's question about the pot. There's actually two statutory provisions. The first is at A-4. A-4 is at page 7a of our brief. That says that the secretary shall certify for payment out of past due benefits so much of the maximum fee as does not exceed 25 percent. The maximum fee, if you look throughout the prior provisions of A, talk about the maximum fee that the commissioner approves for work before the agency. So that A-4 provision mandates that so much of that maximum fee, that is the agency fee, as does not exceed 25 percent, shall be paid. It's mandatory. Now, I think there's two things. First, it's mandatory. The pot must be 25 percent at least if the agency fee is that large. And two, the language so much of the agency fee as does not exceed emphasizes that Congress understood that the agency fee could and would sometimes exceed 25 percent of past due benefits, which itself is incompatible with an aggregate 25 percent. It's a different argument. Different argument. But while we're on A-4, I thought I'd touch upon it. The second provision is in B-1. That's on page 8a. It's in the latter half of the main paragraph that the secretary shall certify the amount of such fee, referring back to the court-approved fee for court work, as does not out of and not in addition to the amount of past due benefits. That is in the permissive. It is may certify. So the agency has interpreted the mandatory obligation to set aside 25 percent for agency fees and the permissive obligation, the permissive authority to set aside money for the court fee, which itself is capped at 25 percent, as allowing it to only pay out 25 percent total. Right. I understand that. And it comes ultimately from an interpretation of the statute. Maybe you're saying it's not mandated by the statute. It's an interpretation of the permissive part of the statute. Right. That's what I mean by saying it's not, maybe it's not mandated by the statute. So it's not. So when Congress was enacting these provisions, in any cap that might exist, Congress understood that it was authorizing the agency to withhold more than 25 percent with the operation of these two. There's another point to be made that I think we haven't focused on, is that we've only been talking about attorney fees, because this case involves an attorney. But Congress has authorized non-attorneys to represent agency clients before the agency. And in subsection E of 406 specifically directs the agency to extend the fee payment provisions, the direct payment provisions that we're talking about in 8-4, to non-attorneys. But in doing so, Congress in E-2, unfortunately we didn't reproduce this in our brief, but it's in E-2, set forth prerequisites for these non-attorney representatives to be eligible for this direct payment. Not all of them meet those eligible eligibility requirements. So there is a category of cases that 8-4 never comes into play because there's no authority to provide direct payment to the representative. Now, those representatives are still representing clients before the Social Security Administration, and they have to collect their fees, or they wouldn't be doing it. And I think that addresses, Justice Sotomayor, your concern. It's baked into the system that these representatives are going to collect sometimes the fees from the client. Now, these — in Social Security Title II cases, there's no — there's no means testing. So you can have a rich client, you can have a poor client. But the important point is that Congress intended not only sometimes to get 25 percent pot. But we're told by the amicus brief of the disability attorneys that that almost never happens. Almost never happens. That they try to get the money directly from the client. Now, maybe that's not correct, but that's the point. That cannot be correct for the set of non-attorney representatives that are not eligible for direct payment under 8-4. The only way they can get their money is from the client. Also, if you look at the criminal prohibitions in — Sotomayor, how often are those people family members or — That I don't know. But I do know that there are — the criteria that Congress has specified under E-2 does not contemplate that we're talking familial relationships. You say there's no danger or little danger of garnishment of future benefits. But you also say that sometimes the government permits garnishing to help attorneys satisfy awards under 25 percent when they have missed out on withholding. Where do you get that authority from, to permit garnishing or to permit garnishing above the 25 percent? I can understand if — It's not above the 25 percent. I think what you're talking about is in the circumstance that the agency, for some reason, has erroneously failed to withhold 25 percent of past-due benefits, it recovers as an overpayment of past-due benefits from the future stream. And this is not an uncommon event. For instance, sometimes there are overpayments in either the Title II or the Title II that offset from future payments to recoup that money. This is just another illustration of that. And it doesn't, I think, what you need to do to the poor recipient, it doesn't really sound like they were responsible for your failure to withhold. I'm not sure what gives you the authority. Basically, you're garnishing their benefits. Well, I don't think that, first of all, no one has questioned the government's authority where the government has already paid the money that should not have been paid. In most contexts, the government can recover money that is overpaid from individuals. I don't find that to be particularly telling, and there are regulatory provisions that govern that to make sure that the recoupment of this overpayment is not onerous. But what, again, getting back to the question presented in this case, I think it's clear that Congress contemplated, if you look at A-5, which is the criminal prohibition prohibiting collection of the fee beyond that authorized by the court, by setting a criminal prohibition and setting the threshold, you know, beyond what's authorized, Congress contemplated that if it's under that authorization limit, you could collect it. And it's not an abusive collection because the fees have been approved, either by the agency under 406A or under the court under 406B. You obviously have a good textual argument. I think the point is your brief then goes to great lengths to say, don't worry about taking 50% from disability claimants because district courts won't allow that under the reasonableness prong. And the amicus brief of disability attorneys say, don't worry about that seemingly extreme 50% fee because that never really happens in practice, both of which suggest that this system was not designed to be one where you're getting 50%. I don't think that's entirely true. You still have a strong textual argument. No, no. I think we went on the text regardless of the policy. I understand that. But the – I think on the policy, there are going to be cases where you're going to get greater than 25%. For instance, there are cases where there's representation in an overpayment case, as we were just discussing. Well, maybe you get – and as a result of an overpayment case, you don't get past two benefits, but the agency and the court may well approve a reasonable fee for payment in such cases. There are other cases where disability, the onset date is sufficiently late. For instance, new evidence came in on remand. There's a five-month waiting period before you're eligible for benefits. So it may be that even if you're found disabled in the proceeding – Kagan. But I think the import of Justice Kavanaugh's question is that in the usual case in which there are proceedings both at the commission and at a district court, and there are two 25% caps, it's not the government's position that in that usual case where lawyers can say, well, I won here and I won there, that both of them are entitled to 25% fees, or that both of them should get 25% fees. In the normal case where you've got a substantial amount of past due benefits, we think that's not the case. When there are small amounts of past due benefits, if there's only, say, $5,000 of past due benefits, we're only – we're talking about very small amounts of compensation for attorneys. And it's important to recognize also that we're only talking about the past due benefits. For a disability complaint – Kagan. You know, what strikes me is, you know, troublesome about this, and then you can add a court of appeals proceeding to it, and the possibility of 75% fees. So, you know, could that possibly have been what Congress wanted? Well, I guess there's two points. One, Congress was concerned not only about past due benefits, but Congress would have understood that for a disabled person, and particularly one who is permanently disabled, ongoing future benefits, which are untouched by these caps, are protected. And in fact, they protected them under 407. The second point is, I think you raised the question of 75%. The government's view is that the cap in B, 406B, is 25% for all of the court proceedings, including appeals. And there's multiple reasons for that. We think the text, when read in light of the Dictionary Act, is amenable to that reading. But if you took the opposite reading, you could have four, five, six proceedings with multiple remands coming up to this Court, perhaps. There's no way you can get more than 100% of past due benefits if there are five proceedings. So that anomaly suggests that our reading of a 25% aggregate cap for the judicial proceedings is what was intended by Congress in 406B, which would then suggest that normally, although there's not always the case, it's not always the case because sometimes agency fees can exceed 25% of past due benefits, normally it should not exceed 25%. And so in the case of the Dictionary Act, the reasonableness criterion is that the reasonableness criterion allows courts to police for whatever reason. What's your definition of smaller versus more substantial that you used in response to Justice Kagan's question? Well, I think it will depend on the amount of time and litigation spent on the case. Because the money is coming right out of the claimant's pocket. It's coming out of the past due benefits. That's correct. And so for in this case, you know, this case I think we would have, it falls somewhere in the middle. Page, you know, 12, we have kind of a chart with all of the sums, and we're talking about a past due benefit award of about $35,000. Right. And it comes right out of the claimant's pocket, and it's unusual to have a 50% chunk out of a claimant's, out of a party's pocket. That is true for many court cases, although I don't believe it's unheard of. There are, depending on the risk. No, I said unusual. Yeah. And in a lot of these cases, we must understand these are all generally taken on contingency. So, and we're talking about low stakes, and there's uncertainty about how many, if any, past due benefits, even if people don't have them. Well, it's low stakes for the attorney, but it's high stakes for the claimant. That is true, but again, there are two countervailing interests that Congress was trying to address here. One was excessive fees, which I think will depend on the circumstances of the case, what is excessive. But the other is ensuring adequate representation for claimants. That's an important element of this. And if the cap is too high. That's where, I'm sorry to belabor this, but that's where the amicus briefs of the disability attorneys comes in, because they say they usually agree not to take more than 25%. So I'm not sure how your point about the incentive structure actually fits what's going on in those areas. I think attorneys, the fee, the typical fee agreement that exists caps out at 25% of past due benefits, both for the agency and for the claimant. Exactly. So you don't need 50% to incentivize. Well, there are different fee agreements, both for the agency at 25 and for the court 25. That's what was at issue here. So if you were to look at the fee agreements that were assigned by Mr. Culbertson and the claimant in this case, it actually would be a 50% fee that was agreed to. So I think the what you may be referring to in the agency or in the amicus brief was fee agreements are 25%, but there's a fee agreement for agency proceedings and there's a separate one for court proceedings. So if I understand what you're saying to us, Mr. Yang, there have been one could respond to some of these qualms about a 50% fee by saying don't worry, it will never happen. But you are specifically not saying that. You are saying in a case where there are proceedings at two different levels, 50% fees is going to happen and it's going to happen in order to ensure representation at both of those levels. It may well happen. Those fees would have to be determined to be reasonable, but in that there is a judicial as well as an administrative check on that. But, yes, if it is a reasonable fee in those circumstances, sometimes it may well be 50%, and that is a necessary consequence of the providing sufficient incentives that Congress thought would be appropriate in this context to incentivize counsel both at the agency level and before the court. Roberts. Thank you, counsel. Thank you. Ms. Wild. Mr. Chief Justice, and may it please the Court. Section 406 is not a model of clarity. It's a piecemeal statute that was enacted over a series of amendments over a course of 50 years. But the best interpretation of its provisions, one that the agency has adopted and argued in favor of in the courts for half a century, up until April of this year, is that it imposes a 25% aggregate cap on agency and court fees. There are three primary reasons why this is the best interpretation of the statute. First, it is the most plausible reading. When you take all of the amendments as a whole, when you read it in the order of the enactment of the amendments, and if you look at the multiple references within them to a 25% cap, and if you look at the fact that the eye toward the purpose of the statute is to regulate attorneys' fees in a fair manner to protect the benefits of the disabled with one 25% withholding, it is a reasonable, plausible interpretation. And it is one, second, which the agency agreed with and devised a framework for the agency and before the court. And they created this framework with, as its most notable feature, this one 25% cap, which would make little sense if there was not an aggregate 25% cap on fees. There's one 25% withholding. And also, third, the capping of these fees by 25% balances what we know to be Congress's intent. It was stated in 1965 in enacting the first 25% cap. They were concerned about the inordinate attorneys' fees that were being collected when the court fees were not being regulated. At the time, the agency fees were regulated to $20 or $30 if you had to go before the appeals counsel also. But there was no cap on court fees. And they were concerned by just 33%, but a third to a half of fees being paid to attorneys for having to take these cases to court. If the claimants had been successful originally and the agency hadn't wrongfully withheld the benefits, the claimants would have had 100% of their past-due benefits. MR. WESTMORELAND. Counsel, on that, on the incentive structure point, I can surely understand the impulse. And I feel that the 25% is quite a lot. Even if past-due benefits, I know future benefits are untouched. And that's a sympathetic position. But couldn't a rational Congress also think that there are some extraordinary cases that are hard, and in order to incentivize attorneys, more might be appropriate? In order – I mean, if you overregulate, you create scarcity, right? And if you overregulate the availability of attorneys, nobody's going to take the case. MS.  That is correct. MR. WESTMORELAND. And so here, isn't it at least conceivable that a rational Congress might think there would be an odd case where you need above 25%, up to 50, but we're going to put in special checks, a reasonableness inquiry at the administrative level and a reasonableness inquiry at the district court, all of which is subject to further review, I'm sure. So why is that an irrational scheme to provide incentive structures so that people do have representation and that there isn't artificial scarcity? MS. WESTMORELAND. See, it's not an irrational scheme to say they would have done it some other way. They did it this way because this is the way that balance – MR. WESTMORELAND. Okay. So your argument is that on the text, you win, but as a matter of policy, you admit it's a draw. MS. There's a disincentive to taking cases because of a cumulative 25 percent.  WESTMORELAND. You admit a reasonable Congress could worry about that scenario? MS. WESTMORELAND. This Congress did worry about the scenario of their getting more than 25 percent. And they had to balance because they wanted to make sure people were going to take these cases. And as it turned out, they do. There's a very healthy Social Security bar. We also have the EJFEs to help protect attorneys. And if you – MR. There's this example, an example where they might get more. They work very hard, long hours, and they get the client disabled. And as a result of that, the client gets $5,000. But the client also gets up to as long as he lives. That's all future. So the client eventually will get half a million dollars. And so the lawyer says, look, I worked for four months. And I know the past amount's only $5,000. But when you look at what I got from my client, it was half a million. And I spent hours. So please, give me not just $1,250, but $2,500. MS. WESTMORELAND. But have I – I'm using that as an example in my mind, as an example of where, well, this could be justified. Now, do I have it right? That's what I'm not certain about. MS. WESTMORELAND. Well, if you look at the way this works – MR. BOUTROUS. Is my example right? MS. WESTMORELAND. Well, your example probably isn't going to come out that there's four months. The way this really works is, if you go before the agency and you win, you get agency fees. You can get up to 25 percent. You're probably not going to have been there for more than four, six months, maybe a year. But you get the benefits that are accumulating over time. It's sort of like passive money. It's accumulating over time. So as the benefits –  BOUTROUS. It all adds up to $50,000 because of the accumulation. MS. WESTMORELAND. And he would like $12,000 more because he had to go to court, and that took another two years. And besides, the client will not get $50,000. He will get half a million because he's going to live for about 90 more years. MS. WESTMORELAND. But what you have to take into account, Your Honor, is the fact that when –   I need to know, first of all. MS. WESTMORELAND. Right. MR. BOUTROUS. Is what I say – this is a tough statute for me. I mean, is this – have I got the example right? MS. WESTMORELAND. Well, the example's right in terms of if you go before the agency and you lose, you have to go to court. That's what happens in all of these cases. MR. BOUTROUS. Counsel, I think what Justice Breyer is getting at, and I think it's a premise of my question, too, is isn't it fair to say that in a significant number of cases that future benefits are larger than past benefits? MS. WESTMORELAND. Yes, future benefits are. But I disagree with the concept that you won't be hounded. I do believe that there is definitely leeway in the statute, and leeway in 407, for claimants to be hounded after these past due benefits. Because 407 only allows – only says you can't go after future benefits. But 406a cannot go after future benefits. But these are past due benefits. MR. BOUTROUS. See, that's what I was worried about. In other words, the client, the lawyer, cannot ask for a fee resting on the fact that he got the client a million dollars, but most of it's in the future. MS. WESTMORELAND. He got the client – who knows what's going to go, something's going to happen   BOUTROUS. No, I know. MS. WESTMORELAND. He did what he did for him then. And the – SOTOMAYOR. Well, I think maybe we should just be practical, okay? Let's assume that there's 25 percent of the judgment that wasn't paid out. What do you think the lawyer can do to get that 25 percent? MS. WESTMORELAND. If there were – SOTOMAYOR. He can't go after the future benefits, correct? MS. WESTMORELAND. I don't believe that's necessarily true, because the future benefits cannot be gone after, but these are past due benefits. So the – SOTOMAYOR. Let's stop there. So you're saying, yes, he could potentially go after the pot of past due benefits up to the excess that he wants?  MS. WESTMORELAND. Right. There's a 25 percent withholding, and that will be paid out. If there's an additional 25 percent that's awarded to an attorney, the client will already have received the 75 percent. But he will – as the cases in the Ninth and Tenth Circuits have suggested about going after the fees when they're over the 25 percent withholding, they have to find other ways to get them. One way you can get them is saying they are past due benefits, and they might have been put into your bank account, they might have been put into your house, but you can attach that, because you have certified – court or the agency certified them as past due benefits. So they are available. And number two, they could be considered to be wrongfully not withheld. That's what happens when the agency allows you to go after future benefits now. Right now, there's 25 percent withholding. So if you – if the agency – SOTOMAYOR. I think that may be wrong on your part, because the agency is only authorized to withhold 25 percent.  WESTMORELAND. Right. SOTOMAYOR. So I don't think you can claim that they wrongfully didn't withhold an additional 25 percent. MS. WESTMORELAND. That's because the agency's framework is set up for a 25 percent aggregate cap. Remember, they've been – SOTOMAYOR. But that's legislatively imposed. MS.  Correct. I take your point that there could be garnishment on the past due amounts is what you're saying. I'm presuming also that that attorney could withhold documents from the client, could do anything else a lawyer does when they're not paid, correct? MS. WESTMORELAND. Right. And these are not typical clients. These are clients who only are in this position because they were wrongfully withheld their benefits in the first place. They should have been paid. SOTOMAYOR. Your friend on the other side says that this just doesn't happen. That these lawyers do not go after the recipients. And you say that it's a real danger. Is there any – how do we tell? How do we tell who's right? I mean, I understand your point of view that theoretically this could happen, but in the real world they said it doesn't. MS. WESTMORELAND. Well, they're asking now to be able to be paid more than 25 percent for a purpose. It's not like they're saying we're going to settle on every single case for just the 25 percent that's withheld. Obviously, they're asking for the extra 25 to be able to get it from the client. Sometimes the client will pay it. We – I have presented the Court with cases in the Tenth and Ninth Circuit where 47 percent of the pastor benefits were awarded. There was still just a 25 percent withholding. They're not asking for a pyrrhic victory. They're asking for the money. KAGAN. Ms. Loew, I take the point that indeed Mr. Yang suggested that this happens and that it was meant to happen. But – so that's troublesome. But I'm struggling with your textual argument. Where does it come from? MS. WESTMORELAND. Let's discuss that, because both the Petitioner and the claimant have said that the two words – there are two words in this entire statute that just make their position correct and say that you can get up to 50 percent of benefits. And those two words are such representation in Section B. And I suggest, Your Honors, that actually – SOTOMAYOR. Are there such representation before the Court? MS. WESTMORELAND. Yes. SOTOMAYOR. In B and in A before the Commissioner.  WESTMORELAND. Well, their argument really has been pointing to the B language of such representation before the Court. And they claim that that shows that you can get up to 50 percent of the past-due benefits. But I would suggest, Your Honors, that actually supports a 25 percent aggregate rule, because what the statute provides is only – you can get up to 25 percent of past – up to, not – definitely get 25, but up to 25 percent of past-due benefits for court representation if you're successful. You cannot be successful unless there has been attorney representation. Somebody had to present the case before the agency. They might have originally lost, but if that case is later won before the Court, two things happen. Number one, the agency attorney who first represented them is going to get fees for what they did by presenting the case, because all the evidence has to be presented to the agency. It's not presented in court. Number two, most cases are sent back by the district court, even a win, is sent back by the district court on a remand for more evidence. In this case, for example, they had looked at the district court judge or magistrate judge in this case, said that the ALJ didn't really consider the rule. Kagan, I guess I don't quite get the argument. You know, the such representation language says 25 percent for court representation. Right. And then you're saying that there's some kind of implicit exclusion as to another 25 percent or however much it is for agency representation. Where does the exclusion come from? I'm not actually arguing exclusion. What I'm arguing is in order to get a court fee, you have to have an agency also. So it's not as if this court fee controls what happens with the agency. I tried to put it in terms of a timeline in my brief. I suggested to the court that while the case was pending before the agency, these past two benefits were accruing. The court attorney can't take credit or have some sort of responsibility for those fees. It's sort of a fiction, a legal fiction. Those are benefits were accruing while the case was pending. Kagan, but the statute is set up so that there are very specific sections governing agency proceedings and court proceedings. So the statute is set up in a way that is not really consistent with that argument. It seems to treat these as two different proceedings, and it seems to treat fees for those two different proceedings as discrete inquiries. Yes, Your Honor, and they are because of the way it works. You can go before the agency, and if you win, you can get up to 25 percent of the past two benefits and you go home. It's over. If you go before the agency and you lose, you don't get paid a fee. You go before the court and you can get up to 25 percent if you win. There may be an agency attorney might also be awarded a fee, too, or not. It could be that they represented them pro bono. It could be that they were represented by themselves pro se. It could be that the legal aid represented them. You might only have a court fee, so you have to have up to 25 percent there, too. That's how it started. There was already an agency fee that was taken care of. So both of them have the up to 25 percent because there only might be in the end one attorney, either the court attorney or the agency attorney, getting the fee. But the question is what do you do when they both get fees? And I tried to illustrate in the brief in terms of a timeline that these fees are accruing over time. The court attorney shouldn't be getting the fees that were accruing while it was before the agency, and the agency attorney has no reason to be receiving the fees as they were accruing before the court. It makes sense that they split them. That is the only argument, that is not an action. That is not what we anticipate. Kagan I mean, it makes sense that they split them. But you're not suggesting that there's any place in the statute that you can point to and say, look, that provision is the provision where Congress indicates that it makes sense that they split them. You — I really have two arguments on that. Number one, their plain text argument is wrong, and, number two, you can kind of get to our position about the aggregate by reading the statute together with the amendments and the fact that there's one pool from which these benefits are withheld. But to get to their plain reading, their literal text, they argue that the plain reading in the statute is, well, there are two, two 25 percents, and they both get them and they can get up to 50 percent. If you actually literally read the statute and you don't know anything about the regulations, you would actually read A, and A would say, if you go before the agency and you lose, you don't get a fee. If you go before the agency and you win, you get paid a fee. It's over with, and they get benefits, and you get paid a fee out of the benefits. Or, other option, too, you go before the court, and if you get a favorable judgment, you win. And that was the view that was adopted on — that is actually the literal reading. And it was the view that made — formed the basis of the single tribunal rule. That was the Sixth Circuit's rule. They said, well, whichever form you win in, that's where you get paid a fee. That you can look and see if there's any work done in the other form, but whatever form you win in, you get a fee. Well, nobody thinks that's right, but that actually is the literal reading of the statute, one or the other. The only reason we're here is that we know that that's not how you read it, that you have to read the regulations that are incorporated into the statute and the way they work, the fact that they both collect fees, the fact that there's one withholding, which really would make no sense. Congress, when they gave the delegation to the — first the board, then the secretary, then the commissioner, to establish regulations, set up this framework. And when they set up the framework, it was all centered around a 25 percent aggregate. They argued, and constantly, in cases before the courts, in favor. And I've presented some of the language to Your Honors in my brief. They've suggested, however, that in 1993, they backtracked and said, oh, actually, they've been flip-flopping. No, they've never flip-flopped over this. The Hornstein case that they cite in their brief about saying set different statutory maximum allowable fees in A and B was talking about this single tribunal rule. And — Congress used the phrase in the aggregate in one place that they rely on as well as part of the textual argument, which is the title — the subject — or the two in the 16 benefits they use in the aggregate there, and don't use it here. Do you have a — That is unfortunate. This is not the best-written statute. If it had been more clear, we certainly wouldn't have been here. I mean, it sounds like you're saying they didn't — Congress didn't think through in its language the exact situation on the ground. But I don't know what we're supposed to necessarily do with that. What you do with that is — well, you say, why did that happen? Because this is a piecemeal statute. They started out with Section B. When the A fees were pretty small, and they came to B and they said, we're having a problem here in ordinantly large fees. We need to be able to rein those things in. And we're going to balance the interests of the claimant not having excessive fees of 33 to 50 percent of their benefits being paid out to attorneys' fees, but then paying them enough and making sure they get paid. See, that's key. You can't make sure they're paid if you have 125 percent withholding, but you're allowing 30, 40, 50 percent. That's no assurance there. In fact, those — I mean, it seems — to support your point, it seems almost absurd that Congress would have wanted litigation or actions by disability attorneys against disability claimants. Congress would not want any of this. That said, the in the aggregate is missing, and the text is a problem, as you acknowledge. But it might be possible that they didn't think they needed it because of the way they put forth all these statutes and the way they kept putting in the 25 percent cap and the way the agency had read it. What about the language — I'm sorry. From the very beginning, they had had the 25 percent withholding and 25 percent cap. Kagan, what about the language that Mr. Yang referred to in A-4? This is the language about payment in an amount equal to so much of the maximum fee as doesn't exceed 25 percent of past due benefits, which suggests that the maximum fee could be more than 25 percent. I actually think that that language came from a 1990 conference report. And trying to understand what all this is, you have to read all this legislative history. And part of the legislative history was there was a discussion going on in the 1990 Senate conference report when they were discussing the fact that the way the system was set up, you would determine past due benefits. First, you would — if you got — if you had a disability and SSI claim, you had to first backing out, reducing it by the amount of the SSI before you determine the attorney fee. And the reason they were doing that is they were saying that the person ended up really not needing the SSI. They were made, effectively, poor by the fact that we weren't paying them the disability originally. So when we're going to determine attorney's fees, we're going to reduce the amount of the past due benefit pool to be paid from. We're going to back out the SSI payment. And then we're going to take 25 percent of that. That was the way the setup was. And then they put in the new A4 and the new amendments for the fee agreement process. And in that, they put in a section saying, well, the way we're going to do it now is we're going to let them determine the past due benefits out of the disability benefits without reducing it. But there's still, when we're going to pay them, we're still only withholding the 25 percent. So they're only going to be able to be paid that, even though they're going to be able to get an award now of the disability benefits without the SSI backed out, when it comes to being paid, they're going to have to only get from us the 25 percent after the SSI reduction. Ms. Wheel, I believe it helps you, doesn't it, that the probability of there being an award over 25 percent of the past due amounts is when no past due amounts are awarded, correct? Because an attorney can receive a reasonable fee. Correct. In an overpayment or a termination case? Exactly. And so in those cases, it's always going to be 25 percent, more than 25 percent. Well, yeah, there won't be any past due benefits. Exactly. Are there any other situations in which the 25 percent, over a 25 percent could be, in fact, calculated? Because the government's making much of this, that Congress contemplated it. And I thought your brief said they contemplated it only in the two circumstances of where there's no past due amounts. Well, that's correct. I mean, the only time you would be getting benefits, the only time these cases would come before without past due benefits being available to determine the 25 percent out of would be overpayment and termination cases. I think it's very important to keep in mind when we are looking at this as a whole to determine what Congress had intended in terms of who we're talking about. Again, these are claimants who, had they originally gone before the agency and been awarded their benefits, they wouldn't have had anything out of them. They would have had 100 percent of their benefits awarded. But now agency wrongfully, and it turns out they agree wrongfully, denied them the benefits. So over a course of years, these past due benefits are accruing. This isn't nothing. This isn't a small ---- Isn't that exactly the hardest cases where you maybe are most in need of good legal services and lawyers might be least likely to participate? Well, that's the fortunate thing about, A, the 25 percent does satisfy the attorneys, and, B, the EJA award can be in excess of that. You can make the claimant whole and the attorney can go ---- But you agree with the premise that these are the cases, these are the hardest cases where attorneys are most useful, perhaps? Well, I think they're necessary to go into court. I don't know necessarily the hardest cases, but definitely ---- They've lost below. They've lost below. They lost below. And now they're going to court. And now they're going to court. And my point being that had they not had to go to court, had they not had to go to court and had they been rightfully paid, then they wouldn't be paying any attorney's fees. So a lot of people might think, well, maybe the government ought to be paying their fees. Sure. That would be a reasonable judgment, too. But instead, this is coming out of past due benefits. So you have to determine, and Your Honors have to determine, what did Congress intend when they were doing this? When they put the statute out, when we know they thought 33 percent to 50 percent was inordinately high, what did they actually intend to have happen with the agency? And the agency determined that 25 percent was the maximum. And the agency determined that that 25 percent aggregate was what they would advocate in favor of. And in fact, if I could, Your Honors, I found the brief where they wrote in Dawson to explain their position, which has been maintained for 50 years, for half a century. The most of the benefits provided for by the Act are intended to supply a means of livelihood to persons who have been deprived of their ability to support themselves, e.g., old age benefits for retirees and disability benefits for the disabled. The majority of the claimants for benefits, therefore, depend upon them for a subsistence part of their livelihood. And for most, many of the benefits, that they're sole means of support. Often, by the time past due benefits are recovered from the Secretary, the claimant is in dire financial need. Deduction of a third to a half of these benefits, whatever the purpose, can impose serious financial hardship on the claimant. Congress has sought to balance these needs against that of the attorney by giving the court authority to fix a fee for the attorney when the court renders a judgment favorable to the claimant, and by limiting the amount of that fee to a maximum of 25 percent of the past due benefits. It's plain, therefore, that the court's allowance of a fee in a Social Security case larger than an overall 25 percent of past due benefits recovered would be contrary to Congress's will. That was that was the case. Roberts, I'm sorry, Counsel, what are you reading from? I'm reading from the brief of the government in Dawson. So that was in 1970. Then in Gisbrecht, the solicitor said that the statute's primary goal is ensuring the claimant keeps as much of the back-due award as possible. And then later said, quoted an Eleventh Circuit case, Kay v. Apfel, in the same brief in this Court, that 406B is designed to protect a particularly vulnerable class of claimants. Many claimants in Social Security benefit cases are minors or incompetent, they manage their affairs, or disadvantaged by lack of education or physical or mental impairment. So I think that this Court, in looking at what Congress intended, needs to look at what the Commission had said for years, because they were the implementing body. They were the ones who were reading these, the statutory changes, the amendments as they came along, and they made it consistent, always were consistently taking the position that 25 percent of the past due benefits that had been accruing over the time the case was in court or before the agency was what would be Congress's intent. Congress, the agency, and the courts have knitted together a system with a 25 percent aggregate cap that has been working since 1965. Petitioner and Respondents have urged this Court to pull a thread on that system and to begin to unravel it. I would urge this Court not to do that. The judgment of the Eleventh Circuit, we ask, be affirmed. Roberts. Thank you, counsel. Mr. Ortiz, you have a minute left. Ortiz, you have a minute left.     Ortiz, you have a minute left. Ortiz, you have a minute left. Thank you, Mr. Chief Justice. Let me make quickly three points. It's not the case that overpayment and termination are the only situations where you can get in a situation of having over 25 percent. You can also have those cases under the petition fee process where the agency sets a reasonable fee. There is no restriction on that. The timeline problem that my friend mentioned is really no problem at all, because in Gisbrecht, this Court instructed the lower courts to take exactly that consideration into account in setting reasonable fees under 406. And finally, in Hornstein, although it was primarily a single tribunal case, the Sixth Circuit en banc made clear that the single tribunal rule and the agri-cap rule had to stand or fall together. We ask this Court to reverse the judgment of the Eleventh Circuit and revamp it for further proceedings. Roberts. Thank you, counsel. Ms. Weil, this Court appointed you to brief and argue this case as amicus curiae in support of the judgment below. You have ably discharged that responsibility, for which we are grateful. The case is submitted.